## House *versus* Adams & Co.

*Bills of exchange.*—*Prompt notice of protest excused on account of the political condition of the country.*

The cessation of mails and commercial intercourse between Pittsburgh and New Orleans while blockaded, by authority of the government of the United States during the rebellion; is a sufficient excuse for the omission of due and regular notice of the dishonour of a bill of exchange drawn by a mercantile firm in the former city on one in the latter.

ERROR to the Common Pleas of *Allegheny county.*

This was an action of *assumpsit* by John I. House and Edward House, doing business as John I. House & Co., against Alexander King and Michael McCullough, doing business as Adams & Company; and was founded on two bills of exchange as follows:

"$112.                              "December 8th 1860.

"Six months after date, pay to the order A. King, $112, value received, and charge to account.

"ADAMS & Co., Agents.

"To Messrs. E. F. MIOTEN, N. O., La.

Endorsed: "A. KING,

"ED. HEAZLETON,

"J. I. HOUSE & Co.

"Protested for non-acceptance, May 31st 1861.

"THOS. ————."

[House *v.* Adams & Co.]

" $351.25.                    " Pittsburgh, January 26th 1861.

" Six months, pay to order A. King, $351.25, value received,
and charge same to account Adams & Co., Agents.

" A. KING.

" To BOLES & JUDSON, N. O., La.

   " A KING,
   " ED. HEAZLETON,
   " JOHN I. HOUSE & Co.

" Protested for non-acceptance, June 1st 1861.

" THEODORE GUIOT.

The first was presented for acceptance and protested for non-acceptance May 31st 1861—presented for payment and protested for non-payment June 11th 1861. The second was presented for acceptance and protested for non-acceptance June 1st 1861—presented for payment and protested for non-payment July 29th 1861.

These drafts were endorsed by A. King (to whom they were made payable) to Edward Heazleton, and by Heazleton to House & Co., plaintiffs, in the latter part of April 1861. On the 1st of May 1861, they were handed by House & Co. to the Farmers' Deposit Bank for collection. Owing, as was stated by the cashier of that bank, to the difficulties and dangers of remittance, they declined taking the risk of collection, and returned them to House & Co., May 21st 1861, by whom they were immediately transmitted to Burbridge & Co., their agents at New Orleans. On the 28th of June 1861, a protest of the first draft for non-acceptance was received by House & Co., and notice of the same was mailed on the same day to A. King and Adams & Co., both of whom had their places of business in the city of Pittsburgh. On the 14th July 1862, the protests for non-payment of both were received by House & Co., who on the same day gave notice of the same to Heazleton. Either on the afternoon of that day or on the day succeeding, notice of non-payment was given to King, one of the drawers of the draft, who at the time proposed to leave the question of his liability to an arbitration. About the time of the transmission of the drafts the mail facilities between Pittsburgh and New Orleans had been greatly interfered with, and immediately afterward the transmission of letters to Louisiana was prohibited by government, and the intercourse was not resumed until the latter part of June 1862, and the earliest receipt of letters at this place by the sea route was on the 1st of July 1862. But at that time no systematic intercourse with New Orleans by mail had been promulgated by the government, although at that time the mails were received at intervals. During the whole of the period between the time of the protests of these drafts for non-payment and their receipt

here, there was an uncertainty as regards the transmission of mail and a general business intercourse and exchange of correspondence, arising from the unsettled condition of the country as well as the official orders of the Post-Office Department. This was a matter of public notoriety, without regard to the testimony adduced upon the subject.

By consent a verdict was rendered for the plaintiffs for the amount of their claim, subject to the opinion of the court as to the plaintiffs' right to recover for both or either of the drafts in evidence, and subject to correction of error, if any, in plaintiffs' calculation; and if on the testimony the court is of the opinion that the plaintiffs are not entitled to recover in any amount, judgment to be entered for the defendants *non obstante veredicto*, and subject to the right reserved to either party to take a writ of error.

On hearing, the court below (MELLON, J.) filed the following opinion:—

"Apart from the objection of want of interest in the plaintiffs, which was made but not urged at the trial, it appears to me the plaintiffs failed to give sufficient evidence of any legitimate excuse for want of notice of protest either for non-acceptance or non-payment. Where the political condition of the country is alleged as the excuse, it cannot be requiring too much of the plaintiffs to show not only that such condition did exist, but also that it was the immediate cause of want of notice at the proper time, and that the notice was given as soon after the cause was removed as was possible to do so. I think it was not sufficiently shown what the holder of the bills did or attempted in New Orleans towards giving notice, and for this reason I enter judgment on the verdict in favour of the defendants, *non obstante veredicto*, in pursuance of the agreement of the parties at the trial."

The case was then removed into this court by the plaintiffs, for whom the following error was assigned:—

The court entered judgment for the defendants below, *non obstante veredicto*, instead of entering judgment for the plaintiffs below.

*C. Shaler*, for plaintiffs, argued that—1. The bills of exchange being payable at a time certain after date, there was no necessity of presenting them for acceptance until the same fell due, and if presented before due and not accepted, the holder was under no obligation to protest or give notice: citing Byles on Bills 243, 1 Peters 25, and 2 Id. 170.

2. If the parties were excused by the condition of the country and the suspension of the mails for the delay in giving notice, and Mr. Heazleton received the notice on the 14th day of June,

[House *v.* Adams & Co.]

A. D. 1862, and gave notice to Adams & Co. on the succeeding day, that the notice was then in time to render the drawer liable: citing Byles on Bills 348; 2 Barr 355.

3. That the state and condition of the country, and the testimony in relation to the stoppage of the mail, precludes defendants from taking advantage of the delay in giving notice.

"The holder of a bill of exchange is excused from giving notice in the usual time, * * if the political state of a country renders it impossible to give it:" Chit. on Bills 455; Story on Promissory Notes, § 261.

*Robert Woods* and *Thomas McConnell*, for defendants.—The first bill (the one for $112) was protested for non-acceptance, May 31st 1861, and for non-payment on the 11th of June 1861. The second bill (the one for $351.25) was protested for non-acceptance, June 1st 1861, and for non-payment, July 29th 1861.

After the refusal of the drawee to accept the bills, no demand of payment was necessary: Story on Bills, § 366; Chitty on Bills 390, 391. The bills having been dishonoured by the non-acceptance, the holder was neither bound nor had a right to look after the drawee any further. His only course was to fall back on the drawer and endorsers. In doing that, his first step, and the one without which he could take no other, was to give them prompt notice of the non-acceptance: Bank of Washington *v.* Triplet, 1 Peters's Rep. 25; Chitty on Bills 354; Story on Bills §§ 228, 284. If he did not do that, his remedy against the drawer and endorsers was gone, and no demand of payment and notice of non-payment could help it.

It is said that on these bills presentment for acceptance was not necessary before they fell due. We do not admit the law to be so. But for the purposes of this case it makes no difference. Here the bills were presented for acceptance before they fell due and were dishonoured; and when that is the case, all the authorities agree that notice of the dishonour must be given to the drawer and endorsers, or they are discharged from liability. See the authorities last above cited.

The law in regard to notice of non-acceptance is the same as that in regard to notice of non-payment: Chitty on Bills 354.

It was proven that on the 28th of June 1861, a notice of protest came to plaintiffs of draft of $112, from Burbridge & Co., for non-acceptance or non-payment, by mail, and that one was mailed to A. King and the other to E. Heazleton. That plaintiffs' and King's places of business were both in Pittsburgh. So was Adams & Co.'s. The latter was much nearer to plaintiffs' than the post-office was, and that fact was known to plaintiffs. Their places of business being in the same city, where there was no

penny-post, notice thrown into the post-office was not good: Jones v. Lewis, 8 W. & S. 14; Kramer v. McDowell, Id. 138. It does not matter whether this notice was of the non-acceptance or non-payment; in either case it was bad, both as to manner and time. If it was notice of non-acceptance, it was twenty-eight days after the protest; if it was of non-payment, it was seventeen days after protest. Whereas the postmaster swears that before the war they had received letters from New Orleans in four days; and the law requires the notice to be sent by the first mail after the protest: Story on Bills, § 288; Chitty on Bills 511, 513; 1 Pars. on Bills 509. The burden of proof is on the plaintiff. Mr. Chitty (on Bills 511) says: " The holder must prove distinctly and by positive evidence that due notice of dishonour was given. It cannot be left to inference or presumption." And see note c on same page. By sending to New Orleans the exact facts could have been got at. The plaintiff did not do that, but has left the whole thing to rest on inference and presumption. He must therefore fail.

The second bill was protested on the 1st of June 1861, for non-acceptance, and the defendants had no notice of it till the middle or latter part of July 1862, between thirteen and fourteen months after protest. To excuse this it is said the postal intercourse between Pittsburgh and New Orleans was stopped. If this was so, it would be no excuse. If there is no mail to send the notice by, the holder is bound to look out for some other practicable way of sending it; and if there is a practicable way of sending it, he is bound to send the notice by that way: Story on Bills, §§ 286, 298, 383; Chitty on Bills 505, and note f; 1 Pars. on Bills 484–5–6 and 7, and note o. The means of sending notice outside of the mails was ample and well known. One witness proved that long after these protests he got a bill from New Orleans and another from Mobile, with the protests and notices, through Adams's Express. This being the case, the plaintiffs' agent at New Orleans had no right to put the notice in his pocket, and keep it there over a year, waiting for the mails to be re-established. And having done so, the plaintiffs cannot recover.

The last bill was protested for non-acceptance on the 1st of June 1861. The plaintiffs' agent at New Orleans was bound by law to mail, at New Orleans on the next day, the 2d, a notice of the protest to the drawer and endorsers at Pittsburgh, if there was a mail from New Orleans on that day. There was none mailed on that day. The omission could only be excused by direct and positive proof that there was no mail on that day, and the burden of producing that proof was on the plaintiffs. They have produced no such proofs, and therefore they cannot recover. It seems from the testimony that the department made an order

[House *v.* Adams & Co.]

on the 27th of May, to suspend the mails in Louisiana on the 31st of May, and that notice of that order was received in Pittsburgh on the 1st of June; but there is no evidence as to when it was received in New Orleans, if ever, or as to when the mails stopped there.   Besides, a letter was received by mail, dated at New Orleans, on the 1st of June, and the plaintiffs on the 28th of June got by mail the notice of the 31st of May, or of the 11th of June, which facts make it highly probable, if not certain, that there were mails from New Orleans after the 1st of June.

If the plaintiffs were justified in waiting on the mails, they were bound to send the notice by the very first mail after they were started in 1862: Story on Bills, § 327; Chitty on Bills 486-7, and note *f*; 1 Pars. on Bills 532.   There is no proof that the notice was sent by the first mail from New Orleans in 1862.   The first mail from New Orleans was received about the 1st of July.   The plaintiffs received the notice from their agent on the 14th of July, two weeks after.  This is inexcusable laches, and must preclude the plaintiffs from recovery.

But beside this, the plaintiffs cannot recover because these bills do not belong to them.   W. H. House swears that he took these drafts with their protests up to Mr. Heazleton (the party from whom the plaintiffs got them), and left them and the protests with him on the same day on which the plaintiffs got them, and charged them to Heazleton on his account.   He says Heazleton did not pay them; but he says that when the plaintiffs got them from Heazleton they were credited on his account, and when they were given back to him they were charged on his account; that the books have never been changed since; that Heazleton is a regular customer of the plaintiffs, buys large amounts of goods from them, and makes weekly payments on the account. This certainly makes the bills Heazleton's.

The opinion of the court was delivered, January 2d 1865, by

READ, J.—Presentment for acceptance is not necessary in the case of a bill of exchange, payable at a certain period after date, and in Pennsylvania the drawer is not discharged for want of notice of non-acceptance, provided he receives notice of non-payment: Read *v.* Adams, 6 S. & R. 356.   The question, therefore, in the present case narrows itself down to whether due notice was given of the non-payment of the two bills of exchange which are the subject of this suit.

The first bill was for $112, and was protested at New Orleans for non-payment on the 11th June 1861.   The second bill for $351.25, was protested at the same place for non-payment on the 29th July 1861.   Notice of non-payment was not received by the holders of these bills at Pittsburgh until 14th July 1862, when the protests and drafts were received by them by mail, and

proper notice of their dishonour was given to the endorser and drawers. According to strict commercial law in ordinary cases, this notice came too late, but the state of the country is alleged as an excuse, and it therefore becomes necessary to determine the rule in such cases, and its applicability to the history of the times, and the facts disclosed on the trial.

Judge Story, in his Commentaries on the Law of Promissory Notes, § 257, has enumerated, among the sufficient excuses for non-presentment, and demand at the time and place when and where the promissory note is due and payable, the following :— "(3.) The presence of political circumstances, amounting to a virtual interruption and obstruction of the ordinary negotiations of trade, called the *vis major.* (4.) The breaking out of war between the country of the maker and that of the holder. (5.) The occupation of the country where the parties live, or where the note is payable, by a public enemy, which suspends commercial intercourse. (6.) Public and positive interdictions and prohibitions of the state which obstruct or suspend commerce and intercourse." And in section 356 of the same work, the learned commentator enumerates them also as constituting sufficient excuses for the omission of due and regular notice of the dishonour.

Upon this subject there are two leading cases, one in England and one in America. In Patience v. Townley, 2 Smith's Rep. 224 (1805), which was an action on a bill of exchange by the holder against one of the antecedent parties; the bill was drawn the 1st June 1800, at three months' usance on Leghorn, and was due on the 10th of September, 1800, but was not presented either for acceptance or payment until the 31st of October 1800. The protest stated that it was not paid because not presented in due time. At the trial, before Lord Ellenborough, C. J., this was relied upon as a defence to the action, but the plaintiff proved that from the particular situation of the country, Leghorn being then occupied by the enemy, or in some such critical situation, though the bill was sent out by the plaintiff for the purpose of being presented, it was impossible to present it in due time, and it was presented as early as could be afterwards, and there was a verdict for the plaintiff. This was affirmed by the Court of King's Bench, on a motion for a new trial by Mr. Erskine, on a technical ground not disputing the ruling at Nisi Prius, where Lord Ellenborough said, "it was left to the jury to say whether, from the situation of the country, it was possible for the plaintiff to present it in due time."

In Hopkirk v. Page, 2 Brockenbrough's Rep. 20, a case growing out of our revolutionary war, Chief Justice Marshall, p. 34, uses this language : "The second bill was drawn on the 26th day of November 1775, for 246l. 3s. 7d., and was protested on

[House *v.* Adams & Co.]

the 26th day of June 1776. It was drawn after the commencement of hostilities in Virginia, and before it was protested all intercourse between the two countries was interdicted. Under these circumstances notice is not to be expected, and ought not to be required. I at first doubted whether a bill which for a length of time is held under circumstances which dispense with notice, does not lose its commercial character, and become an ordinary debt. But on reflection, I am satisfied that this idea cannot be sustained, and that to charge the drawer, notice of the dishonour of his bill ought to be given within a reasonable time after the removal of the impediment."

To apply these principles to the present case, it is necessary briefly to refer to the history of the times. On the 20th December 1860, South Carolina passed a secession ordinance, which example was followed by Mississippi, Alabama, Florida, Georgia, and on the 26th January 1861, by Louisiana, whose state authorities immediately seized the United States Branch Mint, and the Custom-House at New Orleans, with the government funds, amounting to more than $500,000, and the United States revenue cutter Robert McClelland was traitorously surrendered by Captain Breshwood to the state of Louisiana. On the 1st of February Texas seceded, and on the 9th of same month the rebel congress at Montgomery elected Jefferson Davis President of the Confederate States of America, and on the 11th March the Constitution of the Confederate States was unanimously adopted. On the 12th April Fort Sumter was bombarded, and on the 14th capitulated, and on the 21st May the rebel congress adjourned to meet at Richmond on the 20th July, where their meetings have since been held.

On the 19th April the president issued his proclamation establishing a blockade of the ports of the seceded states above stated, which, on the 27th of the same month, was extended to the ports of the states of Virginia and North Carolina. On the 3d May a proclamation was issued, calling for three years' volunteers, and increasing the regular army and navy, and on the 10th May martial law was declared on certain islands on the coast of Florida. On the 26th of August the president, in pursuance of the Act of Congress of 13th July 1861, declared the inhabitants of these states in a state of insurrection against the United States, and that all commercial intercourse between the same and the inhabitants thereof and the citizens of other states and other parts of the United States is unlawful, and will remain unlawful until such insurrection shall cease, or have been suppressed. On the 12th May 1861, the president, by his proclamation, declared that the blockade of the ports of Beaufort, Port Royal, and New Orleans should so far cease and determine from and after the first day of June next, that commercial intercourse

[House *v.* Adams & Co.]

with these ports, except as to persons, things, and information contraband of war, may from that time be carried on subject to the laws of the United States, and to the limitations and in pursuance of the regulations prescribed by the secretary of the treasary, in his order appended to the proclamation. On the 1st July 1862, in pursuance of the second section of an Act of Congress of 7th June 1862, the president, by his proclamation, declared that certain states, including Louisiana, were then in insurrection and rebellion, and the civil authority of the United States so obstructed that the provisions of the Act of 5th August 1861 could not be peaceably executed; that the taxes upon real estate under the act aforesaid, within said states, with a penalty of fifty per centum of said taxes, should be a lien upon the same till paid.

Flag-officer Farragut having run past Forts Jackson and St. Philip, New Orleans was surrendered on the 28th April 1862, and the American flag was hoisted on the Custom-House, Post-Office, Mint, and City Hall, and the forts were also surrendered that evening. In the report of the postmaster-general of the 2d December 1861 (Message and Documents 1861–2, part 3) p. 558), he says, "In consequence of the defection of the insurrectionary states, and the termination of the mail service in those states, on the 31st of May last, under the Act of Congress, approved February 28th 1861 (with the exception of service in Western Virginia), it becomes necessary to present the transportation statistics in two divisions; these are shown in Tables A. and B., attached to the report." Table B., at page 602, is headed "Table of mail service in the following states" (including Louisiana), "as it stood on the 31st May 1861, discontinued under Act of Congress, approved February 28th 1861."

By the evidence, it appears that the Farmers' Deposit Banking Company, with whom these drafts were left by the plaintiff for collection about 1st May 1861, returned them, declining to collect them on account of the irregularity of the mails. They were then immediately transmitted by the plaintiffs to Burbridge & Co., their agents at New Orleans.

It also appeared by the evidence of the postmaster at Pittsburgh, that all postal service in Louisiana, and other named places, was suspended on and after 31st May 1861. On the 26th May 1862, the first mail went out to New Orleans carrying ten thousand letters, including the letters which had accumulated in the dead-letter office. This mail was carried by the steamer Blackstone; since then the regular route to New Orleans has been by New York. This cause was tried on the 9th December 1862, and the testimony, of course, is to be taken as delivered at that time.

[House *v.* Adams & Co.]

" The first mail from New Orleans was an enormous one. We received ours from it about the 1st July 1862," says the postmaster at Pittsburgh. " There were considerable intervals between the reception of the first mails after resumption."

The omission of due and regular notice of the dishonour of these bills is therefore satisfactorily accounted for by the entire cessation of all mails and commercial intercourse with New Orleans, a blockaded port, and the only question is, whether such notice was given within a reasonable time after the removal of the impediment. It will be recollected that the only communication between Pittsburgh and New Orleans was by sea through the port of New York, and that the very first mail received was about the 1st of July. Under these circumstances particularly, as connected with the unsettled state of affairs at New Orleans, although in our possession, we cannot say the notice received at Pittsburgh on the 14th July, was not within a reasonable time after the removal of the impediment.

> The judgment of the court must therefore be reversed, and judgment entered on the verdict in favour of the plaintiffs.